**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **B.L. b/n/f** | § | |
| **SONYA BREND** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:18-CV-00057** |
| | § | |
| **COPPERAS COVE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| *Defendant.* | § | |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** B.L. and Sonya Brend as next friend of B.L. (collectively termed Plaintiffs herein), by and through their attorney Martin J. Cirkiel from the law firm of Cirkiel & Associates, P.C. and attorney Todd Kelly from the Carlson Law Firm, and bring this their *First Original Complaint* alleging that the Copperas Cove Independent School District (referred to as "CCISD" and/or "The District") violated the various rights of B.L., as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, and as permitted by law. In support thereof, Plaintiffs respectfully show the following:

### I. PROLOGUE

1.  The vast majority of students who are bullied and harassed at school suffer in silence, each attending school with the simple hope and prayer that they will be left alone. It is well known across the professional education community that those who are not left alone, and continue to be victims of bullying and harassment, unfortunately turn their rage inward. They become angry, then depressed, just like what has occurred with B.L.

2.  For the child's family, there is nothing more disturbing than knowing that your child was a

victim of sexual harassment that you complained about, and essentially nothing was done. This is especially true when that child was not the first victim, but rather just another in a long line from the same inactivity by the same school. It just doesn't stop. To give meaning to their child's experience, they feel a duty to tell their story in the hope the presentation of what their child experienced will prevent the same from happening to another child and another family. In the course of this telling, these victims benefit from a healing effect. This healing and empowerment is even more pronounced, when they tell their story before a Federal Judge and in Federal Court, where the bright light and sanitizing effect of federal law and the Judge's gaze shines upon the issue and forces the Defendant The District to address the issue, as Mrs. Brend has chosen in her granddaughter's case.

## II. <u>BRIEF INTRODUCTION TO THE CASE</u>

3.      B.L. is now 15 years old. For all times relevant to this complaint, B.L. was a student in the Copperas Cove ISD. B.L. was bullied, assaulted and harassed, physically and sexually, numerous times, by a number of different male students while at Copperas Cove ISD. Both she and her grandmother spoke with school officials about the assaults she was experiencing but no investigations were ever initiated, or any interventions ever undertaken to address the problem. Of note, there had been numerous other girls from the same school who have made virtually identical complaints – yet the misconduct continues. Due to the incessant sexual harassment, B.L. began to experience an increase in depression and anxiety. In a related vein, she began to recede from participation in school-related activities, and went from an A student to one with failing grades in some areas.

4.      With all this in mind, Plaintiffs' ask that B.L.'s sexual harassment injuries be addressed and

remedied, due to the acts and omissions of Copperas Cove ISD and the discrimination B.L. experienced. As such, Plaintiffs bring forth this lawsuit pursuant to 20 U.S.C. §§ 1681-1688, (Title IX, Education Amendments of 1972).

## III. <u>JURISDICTION</u>

5.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

## IV. <u>VENUE</u>

6.    Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Western District of Texas and in the Waco Division.

## VI. <u>PARTIES</u>

7.    B.L. is a citizen of the State of Texas and lives with her grandparents in Copperas Cove, Texas. They live within the Copperas Cove Independent School District catchment area. At all pertinent times relevant to this lawsuit, B.L. was a pupil in the Copperas Cove Independent School District and lived in Copperas Cove, Texas.

8.    Defendant Copperas Cove Independent School District is a school district organized under the laws of the State of Texas and at all times is required to follow the policies and procedures as set forth by the School Board. District personnel are thus responsible for the care, management and control of all public school business within its jurisdiction, as to Plaintiff B.L., the training of teachers at the School, as to safety, supervision of students within the district, and for the course of study. They may be served by and through

Copperas Cove Independent School District's Superintendent, Joe Burns, Ed.D. at 703 W

Ave D, Copperas Cove, Texas, 76522.

## VII. <u>STATEMENT OF FACTS</u>

9.    B.L. is currently 15 years old.

10.   When B.L. entered the 7th grade at Copperas Cove Junior High in August 2015, she was

bullied, harassed and assaulted, both physically and sexually, by various male students,

including J.A., J.S., E.B., and C.W.

11.   At Copperas Cove Junior High School there is a tradition called "Titty Twister Thursday"

and "Slap Ass Friday."

12.   During the time period that makes the basis of the complaints, B.L. was continuously a

victim of these vulgar traditions. Every Thursday B.L. had her breast twisted to the point

of pain and bruising. The boys called this "Titty Twister Thursday." B.L. would try to

protect herself by covering her breasts with her binder. On Fridays, B.L. would be beaten

on her buttocks, the back of her thighs, and lower back to the point she would have welts

and bruises on her body. This was called "Slap Ass Friday." B.L. made at least twenty (20)

complaints about "Titty Twister Thursday" and "Slap Ass Friday," but she rarely received

a response, and the conduct was not thwarted.

13.   When B.L. made a statement, they were supposed to be placed in a box in the office. Ms.

Delogizer was the counselor that B.L. often talked to. If she made more than one statement

in a day, Ms. Delogizer would ask what was wrong, but B.L. was always told to go back to

class. The events detailed below are in addition to the "scheduled" harassment on

Thursdays and Fridays.

14.    Also during this time period, B.L. was particularly vulnerable due to her fear of men and boys. The school was aware that this vulnerability was caused by her father, Eric Linker, who had recently been released from jail. The protective order in B.L.'s school file stated that B.L.'s biological father was not allowed within 500 feet of her. The school knew that B.L. needed protecting, but they failed to perform their duty. Defendant The District had access to her school records, and could plainly see B.L.'s profile, the order, and what was happening and what happened to B.L. However, instead of protecting B.L., the District caused her even more harm by their lack of response to her complaints, just as they had ignored the complaints of the victims who preceded her.

**A.    <u>October 2015</u>**

15.    On or about October 2015, B.L. was pushed in the locker room. B.L. had accidentally fallen, and as she fell, she touched someone, whose full name Plaintiffs do not know but is referred to hereinafter as "E". Another student, M.T., tried to help B.L. stand back up, but "E" continued to act in a violent manner. B.L. did not know the girl she accidentally touched, and she was shocked by "E" repeatedly and intentionally pushing her into the lockers. "E" pushed B.L. so hard that she fell again. B.L. hurt her wrist from this second fall.

16.    Coach Jennifer Forbes should have been monitoring the locker room, but she was not; she was outside talking on her cell phone. Another student went to inform Coach Forbes that B.L. was being bullied in the locker room.

17.    Finally, Coach Forbes walked into the locker room, looked at B.L. who was holding her wrist, and said, "Stupid people should not be doing stupid things!" to B.L. in front of

everyone in the locker room.

18.   Ms. Forbes then took B.L. aside and told her that if she acted up in the locker room again, **<u>she</u>** would get after school detention.

19.   Coach Forbes failed to offer B.L. medical attention.

20.   Further, Coach Forbes treated B.L. as a wrongdoer, without investigation, even though B.L. was clearly a victim of bullying in the situation.

21.   B.L. told her grandmother, Sonya Brend, what happened in the locker room; Mrs. Brend proceeded to complain about the incident to Coach Jennifer Forbes in an email sent on or about October 6, 2015.

22.   Instead of responding, Ms. Forbes forwarded the email to one of the school's Vice Principals, Julie Kearney. There is no documentation of any investigation or any type of response from the District nor is there any documentation of measures they took to ensure B.L. was safe in the locker room. Again, they simply ignored B.L., whose only offense was that she had the audacity to report that she was a victim.

23.   Also in October, Mrs. Brend noticed that she was having to repeatedly buy B.L. new bras. She asked B.L. what she was doing to her bras that required her to keep needing new ones. B.L. told her grandmother about E.B. and J.A., the two main boys who were bullying her. Through her discussion with B.L., Mrs. Brend learned the boys had been assaulting B.L. to the point of damaging her bras.

24.   Mrs. Brend made a complaint about B.L.'s bras being torn. On some of her bras, the latches were bent or broken. One of B.L.'s cashmere sweaters was ripped at the breast area. She also questioned why B.L. was having to cover her breast and butt with a binder.

25.  Mrs. Brend called the school, but had to leave a message on the telephone. In the message, Sonya Brend stated that she wanted to know who at the school was putting their hands on B.L.; at no point did Sonya Brend sign anything that allowed staff members or anyone else to touch B.L.

26.  Eventually, Mrs. Brend went to the school, intending to speak with Principal Thorb; however, Principal Thorb was not at the School. Instead, Mrs. Brend was directed to talk to Stephen Simecek, another Vice Principal at Copperas Cove Junior High.

27.  Mr. Simecek finally agreed that he would contact Mrs. Kearney and Principal Thorb. However, to the best of Plaintiff's knowledge, this never occurred; regardless no action was taken by the District to the complaint(s).

28.  Mrs. Brend waited for an hour; eventually she even went to the cafeteria to find Mrs. Kearney. Mrs. Kearney immediately literally turned her back to Sonya Brend refusing to acknowledge or speak to her. Eventually, Mrs. Brend left as she saw that she was still being ignored. This gesture is perfectly symbolic of the actions of CCISD. when confronted with the report of B.L. and her predecessor victims.

29.  Assistant Principal Kearney called Mrs. Brend on the phone to come back to the school due to Sonya Brend calling another set of parents at the school who had two daughters, one in sixth grade and one in the eighth grade, going to the school.

30.  When Sonya came back to the school, she found Mrs. Kearney and Mr. Simecek in a meeting with other parents as well as the aforementioned two girls.

31.  Neither Sonya Brend nor B.L. knew whom the other parents were, but could overhear the other parents asking Mrs. Kearney questions about "Titty Twister Thursday" and "Slap Ass

Friday." Sonya and B.L. were led to Mr. Simecek's office to speak with him.

32. Sonya Brend asked that Mrs. Kearney look at the security camera footage so that Mrs. Kearney could see for herself what was happening to B.L. and the other girls in the school. This way, Sonya Brend could prove to Mrs. Kearney that B.L. was not the only victim. Mrs. Kearney actually refused to watch the security footage. Further, she went on to state that what B.L. was complaining about were lies and that there was no reason to look at the security cameras. This failure to even watch the obvious evidence placed B.L. and other girls at continuing risk of harm.

33. She eventually deleted the video.

34. B.L. made an average of three complaints a week. In fact, by mid October 2015, B.L. had already made 10 to 12 complaints to Ms. Delogizer, one of the School's counselors, about what was happening to her and how she did not like it. The whole office was on notice regarding the incidents multiple times; they were also on notice of the harassment; however, none of B.L.'s complaints were addressed. Nor to her knowledge was any formal investigation ever done. Again, B.L. was not even the first victim.

35. B.L.'s written complaints were simply shoved into a file by Ms. Delogizer. Although school administrators knew about the bullying, harassment and assault B.L. and others suffered, they intentionally and knowingly failed to investigate.  B.L. never received her complaints back.

36. B.L. believes that at some point Ms. Delogizer talked with J.A. and J.S., two of the boys who were harassing her, but to no avail. Going into November 2015, the attacks became even more vicious. The harassment escalated past the traditions on "Titty Twister

Thursday" and "Slap Ass Friday"; they started to beat B.L. every day with their hands. This is the result of the administration's blatant failure to act.

37. Additionally, Mrs. Brend made numerous complaints to the school about the sexual harassment B.L. was enduring. None of her complaints were addressed, and the harassment continued.

**B.    November 2015**

38. Around November 2015, after B.L. did not attend school on two consecutive Fridays, Kearney called to inquire as to why B.L. was absent. Plaintiffs responded by informing her that B.L. feared being beaten in the school's tradition of "Slap Ass Friday."

39. In mid-November 2015, B.L. came home from school and ran to the bathroom. She forgot to lock the door, and Sonya saw the welts and bruises on her backside.

40. When B.L. emerged from the bathroom, Sonya confronted her about the bruises. B.L. told her grandmother that E.B. and another football player, (name unknown), chased her down. In an attempt to keep herself from being hit, B.L. sat on the ground of the blacktop behind the cafeteria, but the boys grabbed her off of the ground. B.L. tried to wiggle loose by kicking her legs and trying to free her arms, but her efforts only made everything worse.

41. E.B. and his teammate flipped B.L. over and assaulted her.

42. When they finished, B.L. was left all alone and crying. No one would help her due to being afraid of retaliation.

43. B.L. reported the event to Ms. Delogizer, and she made a statement in the counselor's office.

44. Stephen Simecek, the Vice Principal, called B.L.'s grandmother to come to the school.

45.  When B.L.'s grandmother finally met with Stephen Simecek, he rolled his eyes and asked, "What is it this time?"

46.  This statement, though it may have been a sarcastic expression of his lack of concern, is clear evidence that school officials were on notice of the attacks, as well as the pattern of bullying and harassment.

47.  Specifically, CCISD was on notice that B.L. was one of the victims of such common and sexual attacks and incidents of bullying and harassment.

48.  During this conversation with Simecek, Mrs. Brend noticed that Simecek did not take any notes. Again, indicative of the level of concern for the girls at the school.

49.  B.L. had the opportunity to speak with Julie Kearney. Mrs. Kearney asked why it was only her [B.L.] that was having these issues. Given the number of victims who have come forward with similar claims several of whom are represented by the undersigned, this is shocking. She indicated that she would have an investigator, Mr. Kirkpatrick, look into the situation. B.L. was never questioned, and she does not know if anyone else was ever questioned. Plaintiffs were never given a copy of whatever "investigation" was done by the investigator. They never received notice of their right to appeal. The alleged conclusion from this investigator was that there was no abuse.

50.  Sonya Brend also contacted Mr. Kirkpatrick a few times about what was happening to B.L. Mr. Kirkpatrick said there was "no reason to investigate." Upon information and belief, Plaintiffs believe that Kirkpatrick simply questioned his own child, who was also a student at the same school, and concluded that since his child had not seen anything to corroborate Plaintiffs' claims that the Plaintiffs were lying.

51.    Mr. Kirkpatrick did not question B.L. and refused to answer any of Sonya Brend's questions. His investigation was complete after merely speaking to his own child.

52.    On or about November 13, 2015, B.L. reported an incident in which C.W. threatened her because she told him (after having been asked) that she did not like him in a "boyfriend" kind of way. C.W. was not pleased with that response; he threatened to punch B.L. A teacher's aide was present during this exchange, who did nothing, further evidencing the District's failure. Another student actually attempted to come to B.L.'s aid, while the aide responsible for the class said and did *nothing*.

53.    On or about November 18, 2015, B.L. received a note during second period history class from two boys that frequently bothered her, J.A. and J.S. The note said, "We want to grab your booty cheeks."

54.    Coach Garrett Johnson was teaching this history class, and to the best of B.L.'s knowledge, he did nothing to stop the harassment.

55.    This same day fellow student "L.H." shouted, in the crowded cafeteria, "If you want to f*ck B.L. you can cause B.L.'s a slut, cunt, whore, and hoe; she let her own dad screw her too!"

56.    The boys sitting at L.H.'s joined in, yelling "oh yeah, she will be a good one."

57.    B.L. was distraught; following this incident, the few friends she had left stopped talking to her.

58.    This event is particularly troubling because it contained very private information. Plaintiffs believe that the only way anyone could have learned of such was by accessing private student files.

59. Students began a rumor that B.L. viewed the harassment and assaults as a game; this was patently false. These rumors caused further humiliation and distress to B.L.

60. On or about November 18, 2015, B.L. made a written report of the incident and turned it in along with the note to Mr. Stephen Simecek.

61. The same day that J.A. and J.S. sent B.L. the inappropriate note, J.A. intercepted B.L. when she was going to the restroom. He violently grabbed her hips and forcibly slammed her into his groin. This incident was recorded on video.

62. Mr. Royal, one of B.L.'s teachers, also witnessed J.A. rub his crotch against B.L. Mr. Royal said that some of B.L.'s friends had told him what J.A. was doing.

63. When Mr. Royal asked B.L. about it, she informed him that she had already reported it to the principal. B.L. and Sonya Brend do not know whether Mr. Royal reported this event either.

64. Immediately following this sexual assault, B.L. went to the office and tried to speak with Mrs. Kearney. Mrs. Kearney asked B.L. why she was there, and, as B.L. tried to explain, Mrs. Kearney told her that she was not B.L.'s Vice Principal and that she did not need to tell her grandmother, Sonya Brend, about the incident.

**C.    December 2015**

65. On or about December 7, 2015, E.F., another student, brought an e-cigarette to school. B.L. was asked if she wanted to smoke, but she answered no. Instead, B.L. went to report the incident in the office to Mrs. Carlson, another counselor at the School.

66. J.C. found out that B.L. also told on the boys and girls about the "Slap Ass Friday" and "Titty Twister Thursday" in addition to the cigarette incident. J.C. verbally threatened B.L.

saying "snitches get stitches and get thrown ditches just like b*tches, that's you tomorrow."

67.     B.L. came home crying to Mrs. Brend and her husband, Chris Brend, about what happened. Mr. Brend replied "no, that's not you tomorrow 'cause we are taking you out of that school tomorrow and home-schooling you where you're safe."

68.     Then, B.L. and Sonya Brend went to the school to check B.L. out. At this time, they also went to the counselor's office so B.L. could disclose where students hid their cigarettes and booze. B.L. even offered to show them where everything was hidden, but the counselors unbelievably replied, "No, we know!"

69.     When B.L. was being dis-enrolled from the school, B.L. and her grandmother, Sonya Brend went to get B.L.'s uniform from the locker room and some girls asked B.L. if she had seen J.C. B.L. told them no, and was informed she had better watch out because J.C. was after her. Sonya Brend told B.L. that nothing would happen while she was with her.

70.     As B.L. was headed to clean out her locker, she saw that it was already cleaned out, even though she had been checked out only moments before.

71.     On the way out, Mrs. Brend saw and stopped Julie Kearney, the Vice Principal, to let her know where the cigarettes and booze were, expecting her to take the matter seriously.  Ms. Kearney said "okay," laughed, and walked away.

72.     After a period of being home-schooled, B.L. re-enrolled at the same school. She was there for approximately two weeks to see if anything was different.  By her own account, and by the accounts of her peers, nothing had changed.

### VIII. CLAIMS PURSUANT TO 20 U.S.C. §§ 1681-1688 AND TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972

73.     Plaintiffs incorporate by reference all the above-related paragraphs above with the same

force and effect as if herein set forth.

74.    Plaintiffs contend the District, acting under color of law and acting pursuant to customs and policies of the district, deprived B.L. of rights and privileges secured to her by Title IX of the Education Amendments Act of 1972 and by other laws of the United States by discriminating against her on the basis of sex and gender stereotypes.

75.    The acts and omissions of the school district deprived B.L. of her right to not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, on the basis of her sex or gender stereotypes for which the District Defendant is liable to B.L. pursuant to 20 U.S.C §§ 1681-1688 for compensatory damages.

## IX. <u>RATIFICATION</u>

76.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

77.    Copperas Cove ISD ratified the acts, omissions and customs of school district personnel and staff.

78.    As a result, Copperas Cove ISD is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of B.L.

## X. <u>PROXIMATE CAUSE</u>

79.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

80.    Each and every, all and singular of the foregoing acts and omissions, on the part of the District, taken separately and/or collectively, jointly and severally, constitute a direct and

proximate cause of the injuries and damages set forth herein.

## XI. <u>DAMAGES</u>

81.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

82.    As a direct and proximate result of the District's conduct, B.L. has suffered injuries and damages, for which she is entitled to recover herein within the jurisdictional limits of this court, including but not limited to:

    a.    Physical pain in the past;

    b.    Medical expenses in the past;

    c.    Mental anguish in the past;

    d.    Mental anguish in the future;

    e.    Mental health expenses in the past;

    f.    Mental health expenses in the future;

    g.    Physical impairment in the past;

    h.    Physical impairment in the future;

    i.    Various out-of-pocket expenses incurred on behalf of B.L. by and through her family; and

    j.    Future loss of earnings potential.

83.    In addition, Sonya Brend experienced mental anguish in the past.

## XII. <u>ATTORNEY FEES</u>

84.    Plaintiffs incorporate by reference all the above-related paragraphs, as if fully set forth herein.

85.     It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Title IX and pursuant to 42 U.S.C. §2000d et seq.

## XV. DEMAND FOR JURY TRIAL

86.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the District in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Title IX, 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

By:     /s/ Martin J. Cirkiel
        Martin J. Cirkiel
        Texas Bar No. 00783829
        CIRKIEL & ASSOCIATES, P.C.
        1901 E. Palm Valley Boulevard
        Round Rock, Texas 78664
        (512) 244-6658 [Telephone]
        (512) 244-6014 [Facsimile]
        marty@cirkielaw.com [Email]

AND

By:      /s/ L. Todd Kelly
         L. Todd Kelly
         Texas Bar No. 24035049
         tkellyefile@carlsonattorneys.com [Email]
         Terria M. Hutchinson
         Texas Bar No. 24078708
         thutchinson@carlsonattorneys.com [Email]
         THE CARLSON LAW FIRM, P.C.
         11606 North IH-3
         Austin, Texas 78753
         (512) 346-5688 [Telephone]
         (512) 719-4362 [Facsimile]

ATTORNEYS FOR PLAINTIFFS